IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **DR. PETER E. MCGOWAN, et al.,** | CASE NO. 3:19 CV 1073 |
| Plaintiffs, | |
| v. | JUDGE JAMES R. KNEPP II |
| **UNITED STATES OF AMERICA,** | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

### INTRODUCTION

The parties to this tax case are currently engaged in a discovery dispute. Plaintiffs Peter McGowan, Michelle McGowan, and Peter E. McGowan DDS, Inc., seek certain testimony from Defendant United States' expert witness Charles DeWeese regarding prior cases for which he served as an expert. The Government opposes Plaintiffs' line of questioning on the ground DeWeese is prohibited by statute from testifying on the matter. Plaintiffs filed a Motion to Compel. (Doc. 87). Government opposed (Doc. 88) and Plaintiffs replied (Doc. 89). For the following reasons, the Court grants Plaintiffs' motion.

### BACKGROUND

Plaintiffs filed this claim in 2019 for a refund of federal taxes paid under protest for tax years 2014 and 2015. Since the start of litigation, the parties have brought numerous discovery disputes to this Court's attention. At issue in the current dispute is whether an expert witness retained by the Government may or may not divulge certain information to Plaintiff.

The Government retained Charles DeWeese as an expert witness for this case; the Government filed his expert report on July 28, 2021. (Doc. 87, at 2). In the report, DeWeese writes:

> I have been retained by the United States to provide testimony as to the nature of various life insurance products, particularly whole-life insurance contracts and term life contracts, and how such contracts operate and are administered. I have also been asked to analyze the particular insurance contract at issue in this case, and to provide an actuarial analysis as to the amount required to provide the death benefits offered to Plaintiffs in connection with the transaction at issue. Additionally, I have been asked to provide testimony as to employee welfare benefit plans and how such arrangements make use of life insurance policies.

(Doc. 87-1, at 3). DeWeese also details his qualifications as an expert, including:

> I was the group pricing actuary for Connecticut General Life Insurance Company during the late 1970s, with responsibility for all group life and health policies. I also worked on life insurance accounting at Connecticut General . . . I then worked for an actuarial consulting firm, Tillinghast . . . Among my responsibilities, I did pricing and product design work on universal life policies. In addition, I prepared for and passed examinations of the Society of Actuaries in order to become a Fellow in the Society. Life insurance was one of the subjects required. Over the years, I have complied with the requirements of the American Academy of Actuaries and the Society of Actuaries for continuing education . . . I meet the Qualification Standards for Actuaries Issuing Statements of Actuarial Opinion in the United States.

*Id.* at 2. These qualifications, among other professional work in actuarial and insurance fields, are listed in a CV attached to the expert report. *Id.* at 24-26. At particular issue is DeWeese's characterization of his prior work as an expert witness in tax cases:

> I have also had extensive experience with single employer and multiple employer welfare benefit plans. Since I have been in private practice, I have served as an expert in connection with several cases involving welfare benefit plans in Federal Tax Court or in United States District Courts, all of which plans involved life insurance policies, whether whole life, term insurance, universal life, or some variation. I am not an expert in tax or tax accounting, but I have become familiar with certain tax consequences of insurance because such consequences are material to the purchase, sale, and pricing of insurance policies. . . .

> In my experience, I have seen that designers and promoters of these purported EWBPs have put a great deal of effort into designing programs that would permit the use of cash value life insurance products on a tax deductible basis. This has been done by attempting to fit within particular Internal Revenue Code subsections regarding sharing of risk among companies by concealing the build-up of cash value through the use of special policies, or by the use of trusts to hold the insurance policies and to temporarily limit the ability of either the company or the insured individual to access the case value.

*Id.* at 2, 13. DeWeese's CV lists 27 prior cases in which he served as an expert. *Id.* at 26-29.

Because of their impression that DeWeese's experience as an expert in prior cases formed the basis for his opinions in the instant case, Plaintiffs sought to question him on several of these prior cases in deposition on September 21, 2022. (Doc. 87, at 3). The three Tax Court cases on which Plaintiffs sought testimony from DeWeese are *Booth v. Comm'r of Internal Revenue*, 108 T.C. 524 (1997); *Neonatology Assoc., P.A. v. Comm'r of Internal Revenue*, 115 T.C. 43 (2000); and *V.R. DeAngelis M.D.P.C. v. Comm'r of Internal Revenue*, 94 T.C.M. (CCH) 526 (2007).

While the parties have not provided the full deposition transcript, Plaintiffs include the portion at issue:

> Q. On page 13 you say, in my experience I have seen that designers and promoters of these welfare benefit plans have put a great deal of effort into designing programs that would permit the use of cash value life insurance products on a tax deductible basis. What experience are you talking about?
>
> A. Experience in studying plans that were the subject of the Booth, Neonatology, DeAngelis cases.
>
> Q. And they could use that cash value without paying tax on it?
>
> MR. ETTRICH: Objection to the form and foundation.
>
> Q. I'd be happy to explore the facts on the cases.
>
> A. You'd be happy to what?
>
> Q. Explore the facts of those cases. But in your experience, did you have experience where people that adopted these welfare benefit plans could use the cash value without paying tax on it?
>
> MR. ETTRICH: Objection. Sam, he's already -- he did respond to those cases where he was retained by the IRS as an expert. I mean, you're asking about plan details explicitly from those cases. He can't answer that and we'd object to that on 6103 grounds.

(Doc. 87, at 3-4). When the parties could not resolve this conflict, they paused the deposition to consult with this Court. *Id.* at 4. The Court instructed the parties that Plaintiffs could question DeWeese generally about the plans in the prior cases, and that DeWeese could answer in a way that did not reveal granular information. *Id.*; *see also* Doc. 88, at 5.

> Upon resuming deposition of DeWeese, the parties butted heads over the issue again:
>
> Q. We're on page 27 of 39 in the [Neonatology] opinion. So the question again that was asked was, did the term policy in this plan provide a death benefit?
>
> A. Yes.
>
> Q. And did people that contributed to the plan pay more than the premium for that term policy?
>
> MR. ETTRICH: Sam, you know, I really -- this is –
>
> Q. All right. Were there excess contributions above term premiums in that case?
>
> MR. ETTRICH: Sam, this is objectionable. Again, you're plumbing the facts of the case. If you can key it to opinion language I think that would help the parties get past this dispute. But when you just free-wheelingly ask the question, tell me about the facts of the case, I can't determine on the spot whether you're plumbing 6103 information or not. This is not an expedient way to approach this issue. If I understood, the Judge's ruling was to keep things abstracted and rely upon public materials only to the extent you do not. And what you are doing here is you are using public material and then asking for underlying 6103 information from that material. I understood the court's ruling to prohibit that and I will instruct Mr. DeWeese not to answer to the extent it intrudes upon that privilege.
>
> MR. LAURICIA: That's fine. That's fine. And we'll read it for the court and we'll file a motion to compel too. Let me ask the question in a different way.
>
> Q. Respondent is the government in this case and they argued that excess contributions are distributions of surplus cash. Did the excess contributions go to the term premium in that case?
>
> MR. ETTRICH: Sam, again, I think we're not getting past this. I will object on 6103 grounds and instruct Mr. DeWeese not to answer.

Plaintiffs then filed their Motion to Compel on October 10, 2022.

4

## STANDARD OF REVIEW

The scope of discovery includes "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). But "th[e] desire to allow broad discovery is not without limits[,] and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." *Scales v. J.C. Bradford*, 925 F.2d 901, 906 (6th Cir. 1991). Nonprivileged, relevant material may still be excluded from discovery if the Court determines "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The Court also "must limit the frequency or extent of discovery otherwise allowed . . . if it determines that" the discovery a party seeks is outside the scope of Rule 26(b)(1), could have been obtained by the party in another way, is "unreasonably cumulative or duplicative", or is otherwise overly burdensome. Fed. R. Civ. P. 26(b)(2)(C). "Although a [party] should not be denied access to information necessary to establish her claim [or defense], neither may a [party] be permitted to 'go fishing[,]' and a trial court retains discretion to determine that a discovery request is too broad and oppressive." *Surles ex rel. Johnson v. Greyhound Lines*, 474 F.3d 288, 305 (6th Cir. 2007) (internal quotations omitted).

## DISCUSSION

Plaintiffs assert they are entitled to question DeWeese on his prior expert experience in order to assess his qualifications as an expert witness. The Government contends DeWeese's answers would reveal information required to be kept confidential under the tax code.

Taxpayer information is protected from disclosure by 26 U.S.C. § 6103. The statute requires confidentiality of not only tax returns, but also "return information," defined as

> (A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation

5

or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

(B) any part of any written determination or any background file document relating to such written determination (as such terms are defined in section 6110(b)) which is not open to public inspection under section 6110,

(C) any advance pricing agreement entered into by a taxpayer and the Secretary and any background information related to such agreement or any application for an advance pricing agreement, and

(D) any agreement under section 7121, and any similar agreement, and any background information related to such an agreement or request for such an agreement,

but such term does not include data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer. Nothing in the preceding sentence, or in any other provision of law, shall be construed to require the disclosure of standards used or to be used for the selection of returns for examination, or data used or to be used for determining such standards, if the Secretary determines that such disclosure will seriously impair assessment, collection, or enforcement under the internal revenue laws.

26 U.S.C. § 6103(b)(2). But return information may be disclosed in judicial proceedings under the following circumstances:

(A) if the taxpayer is a party to the proceeding, or the proceeding arose out of, or in connection with, determining the taxpayer's civil or criminal liability, or the collection of such civil liability, in respect of any tax imposed under this title;

(B) if the treatment of an item reflected on such return is directly related to the resolution of an issue in the proceeding;

(C) if such return or return information directly relates to a transactional relationship between a person who is a party to the proceeding and the taxpayer which directly affects the resolution of an issue in the proceeding; or

(D) to the extent required by order of a court pursuant to section 3500 of title 18, United States Code, or rule 16 of the Federal Rules of Criminal Procedure, such court being authorized in the issuance of such order to give due consideration to congressional policy favoring the confidentiality of returns and return information as set forth in this title.

> However, such return or return information shall not be disclosed as provided in subparagraph (A), (B), or (C) if the Secretary determines that such disclosure would identify a confidential informant or seriously impair a civil or criminal tax investigation.

26 U.S.C. § 6103(h)(4).

Plaintiffs maintain their questions posed to DeWeese have "nothing to do with taxpayer return information, as contemplated by § 6103, but rather deal[] solely with the structure and operation of the plan[s] at issue" in the prior cases in which DeWeese testified. (Doc. 87, at 5). The Government argues any answer to Plaintiffs' questions would violate § 6103.

The § 6103 definition of return information is broad, and confidential return information "remains such even when it does not identify a particular taxpayer" – that is, even if a taxpayer's identity can be redacted, the return information still cannot be disclosed. *Church of Scientology of Calif. v. I.R.S.*, 484 U.S. 9, 10 (1987). But the Sixth Circuit has held "once a taxpayer's return information becomes part of the public domain through the filing and recording of a judicial lien, it loses its confidentiality and is not protected by Section 6103 if republished by the Internal Revenue Service for tax administration purposes." *Rowley v. U.S.*, 76 F.3d 796, 801 (1996). When information is "clearly already a part of the public domain", it is no longer confidential. *Id.*

Plaintiffs in this case seek answers from DeWeese on whether he has, while serving as a witness in the *Booth*, *Neonatology*, and *DeAngelis* cases, encountered "welfare benefit plans [where the adoptees of the plans] could use the cash value without paying tax on it", whether "the term policy in [a] plan provide[d] a death benefit", and whether adoptees of those plans made "excess contributions above term premiums". (Doc. 87, at 3-5). Any answer from DeWeese to these questions would almost certainly comprise "the nature, source, or amount of [a taxpayer's] income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax

7

liability, tax withheld, deficiencies, overassessments, or tax payments," and would therefore be confidential return information. 26 U.S.C. § 6103(b)(2)(A). Though Plaintiffs insist their questions deal "solely with the structure and operation of the plan[s] at issue" (Doc. 87, at 5), the Court finds the structure and operation of such plans – as income, payments, and deductions – are return information under the § 6103 definition.

This court finds, however, upon a review of the *Booth*, *Neonatology*, and *DeAngelis* cases, that the return information sought by Plaintiffs is already public by virtue of having been disclosed in the Tax Court opinions. *See, e.g.*, *Booth*, 108 T.C. at 530 ("The employer would currently deduct a one-time contribution that it made to the Prime Plan to fund DWB's and death benefits, and the contribution would not be taxable to the employer's employees until received as benefits . . . Death benefits would not be subject to income tax or, with minimal planning, estate tax."); *Neonatology Assoc.*, 115 T.C. at 43-45 ("Premiums on the underlying insurance policies were substantially greater than the cost of term life insurance because they funded both the cost of term life insurance and credits which would be applied to conversion universal life policies of the individual insureds . . . respondent determined that the employer or sole proprietor could not deduct its or his contributions to the respective plan and, in the case of Neonatology and Lakewood, that the employee/owners had income to the extent that he or she benefited from a contribution."); *DeAngelis*, 94 T.C.M. (CCH) 526, at *1 ("These cases concern . . . a welfare benefits fund. . . . STEP used the contributions to purchase and pay the premiums on . . . life insurance policies . . . payable to the beneficiaries of the insured's choosing in the event of the insured's death."). Each of the three opinions discloses and explains the structure and operation of the plans at issue in extensive detail.

While the publication of this return information did not occur under precisely the same circumstances as in *Rowley*, the information within these three cases is "clearly already a part of the public domain"; the return information at issue has not been confidential for more than twenty years. *Rowley*, 76 F.3d at 801. The protection of this information under § 6103 is therefore futile.[1] Testimony from DeWeese regarding his experience with and analysis of this return information would speak to his qualifications without revealing additional return information.

Furthermore, this information appears to be sought in a legitimate effort to establish DeWeese's qualifications as an expert. An expert witness can provide opinion evidence as long as it can be established such expert has specialized knowledge of the issue, bases his testimony on sufficient facts or data, and bases the testimony on reliable principles and methods that have been reliably applied. Fed. R. Evid. 702. His testimony may also be based on facts or data he has personally observed or been made aware of. Fed. R. Evid. 703. But it is not enough to establish an expert's credentials generally; what is relevant "is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

---

1. Plaintiffs argue the information ought to be available to them via two of the exceptions to § 6103's general rule of confidentiality: the exception for "treatment of an item reflected on [a] return . . . directly related to the resolution of an issue in the proceeding" and the exception for a "return or return information directly relate[d] to a transactional relationship between a person who is a party to the proceeding and the taxpayer which directly affects the resolution of an issue in the proceeding". 26 U.S.C. § 6103(h)(4)(B-C). The Sixth Circuit has held that exception B permits disclosure only of information *on a return* directly related to the current proceeding, not return information. *In re United States v. NorCal Tea Party Patriots*, 817 F.3d 953, 962 (6th Cir. 2016). Plaintiffs are not seeking the tax returns themselves but rather return information as defined in § 6103. Additionally, Plaintiffs have identified no transactional relationship between themselves and any of the parties to the *Booth*, *Neonatology*, and *DeAngelis* cases from which they seek return information. Neither of these exceptions apply, but the information is available because it is already public.

In this case, DeWeese writes in his expert report he was retained by the Government "to provide testimony as to the nature of various life insurance products", "to analyze the particular insurance contract at issue in this case", and "to provide testimony as to employee welfare benefit plans". (Doc. 87-1, at 3). While the Government may well be correct in arguing that Plaintiffs wrongly frame the bases of DeWeese's opinions as deriving "solely" from his work as an expert in prior cases (Doc. 88, at 8), that does not mean his prior expert testimony does not form at least part of the foundation for his opinion in this case. Additionally, when the Government states DeWeese's report is "a product of [his] fifty years of experience as an actuary and insurance professional" and is not "based on factual comparisons . . . between [the transaction at issue] here and the various transactions implicated [in the prior cases]", it misses the point that DeWeese's long career in the abstract does not provide a foundation for the specific issues on which he was asked to testify. *Id.* at 7-8. Striking the portion of DeWeese's report "where he mentions that he has seen other purported employee welfare benefit plans . . . as well as [the portion] where he speaks to his experience concerning such plans," as the Government proposes, would not resolve the dispute in this case but would rather merely remove key information regarding the specific foundation of DeWeese's testimony. *Id.* at 8-9.

It appears to this Court, from the deposition transcript excerpts provided by the parties, that Plaintiffs attempted to ask DeWeese not for confidential factual return information, but rather for his impressions of and experience with return information already made public by the tax courts in order to establish his qualifications for the opinion testimony he has provided for the instant case. As long as Plaintiffs do not elicit – and DeWeese does not reveal – factual information not made public by the texts of the *Booth*, *Neonatology*, and *DeAngelis* opinions, their questioning of

DeWeese on his impressions and experiences with the information in the opinions does not violate § 6103 and is permitted.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Plaintiffs' Motion to Compel (Doc. 87) be, and the same hereby is, GRANTED; and it is

FURTHER ORDERED that parties must complete expert depositions by January 31, 2023, and file dispositive motions by March 28, 2023.

                                                       s/ *James R. Knepp II*
                                                      UNITED STATES DISTRICT JUDGE